IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

MARIE ROBINSON, et al.,

          Plaintiff,

    v.

CITY OF OCEAN CITY, et al.,

          Defendants.

Civil Action
No. 10-2129 (JBS/AMD)

**MEMORANDUM OPINION**

**SIMANDLE,** District Judge:

    This matter comes before the Court on Defendant City of Ocean City's ("Ocean City") Motion for Summary Judgment [Docket Item 20], which will be granted because the Court finds as follows:

    1.   On May 24, 2008, Plaintiff Marie Robinson attended her niece's graduation party on 32nd Street in Ocean City. (Pl. Statement of Facts ("SOF") ¶ 1.) She left the party at 10:00 p.m. and, while stepping from the sidewalk into the street, stepped into a pothole. (Pl. ¶¶ 2-3.) The pothole was located against the curb. (Pl. SOF ¶ 4.) As a result of her fall, Plaintiff sustained a meniscal tear of her left knee, bruises, contusions, and swelling. (Pl. SOF ¶¶ 5-6.) Five days later, on May 29, 2008, a man named "John" complained about a pothole in front of 303 32nd Street that had harmed two family members. (Pl. SOF ¶ 21.) There was a second complaint on May 30, 2008 about a "very bad pothole"

1

at 32nd Street. (Pl. SOF ¶ 22.) Fran Inacio, Ocean City's
Supervisor of Streets for the Public Works Department, visited
the area on May 29th, after receiving the first complaint. (Pl.
SOF ¶ 8, 23.) He inspected the potholes, coned them off, and
assigned two employees to make repairs, which were done on June
2, 2008. (Pl. SOF ¶¶ 23, 25.)

    2.   In deposition testimony, Inacio and Michael Rossbach,
Ocean City's Director of Public works, described Ocean City's
methods for maintaining its streets. Ocean City has 93 miles of
streets and 33 miles of alleys. (Inacio Dep. 61:16-17.) At least
twice a year but usually four or five times per year, the Public
Works Department inspects the streets. (Inacio Dep. 24:6-21;
Rossbach Dep. 26:16-17.) The inspection is a "windshield survey,"
in which a public works employee drives the streets looking for
defects, such as potholes, and repairs them as needed. (Rossbach
Dep. 22:9-21.) Inacio acknowledged that, if there are cars parked
on the street, the employees conducting the windshield survey may
be unable to see potholes blocked by the parked cars. (Inacio
Dep. 27:12-23.) He stated that it would not "be feasible to get
out and look behind each car. We would never get anything done."
(Inacio Dep. 28:1-3.) The Public Works Department also responds
to service requests from residents or other members of the public
within one to two weeks. (Rossbach Dep. 28:21-29:19.) In
addition, Ocean City's engineering department surveys the roads

approximately every five years to compile road ratings that inform capital plans on which roads most need to be redone. (Rossbach Dep. 19:4-9.)

3.    Marie Robinson and her husband, Ronald Robinson, filed a Complaint [Docket Item 1] in this Court against the City of Ocean City and other unnamed John Doe and ABC Corporation Defendants responsible for maintaining Ocean City's roads. Marie Robinson made negligence claims against all Defendants, and Ronald Robinson made loss of consortium claims against all Defendants. The Court has jurisdiction pursuant to 28 U.S.C. § 1332(a) because Plaintiffs are Pennsylvania residents, Defendants are New Jersey citizens, and Plaintiffs have alleged over $75,000 in damages. New Jersey law provides the rule of decision.

4.    Defendant Ocean City filed a Motion for Summary Judgment [Docket Item 20] alleging that Plaintiff failed to satisfy the requirements of the New Jersey Tort Claims Act. Ocean City argued, essentially, that it had no actual or constructive notice of the alleged dangerous condition and that Plaintiffs did not show that its road maintenance program, i.e. its efforts to protect against the dangerous condition, were palpably unreasonable.

5.    Plaintiffs filed Opposition [Docket Item 23], arguing that Ocean City had constructive notice because the nature of the pothole indicated that it had developed over a period of time

3

that was sufficient for Ocean City to have located and repaired it. Plaintiffs also argued that they had created a genuine issue of material fact as to whether Ocean City's actions and/or inactions were palpably unreasonable. Plaintiffs' expert witness, Russell J. Kolmus, III, P.E., examined the pothole site and, based on cracking in the road, observed that, "The incident potholes were foreseeable to a qualified roadway maintenance manager." (Kolmus Expert Report at 12.) Kolmus asserted that Ocean City's inspection methods were inadequate because an inspector driving in a car cannot observe potholes that are underneath parked cars. He concluded, "The inspection methods to detect potholes employed by Ocean City were ineffective and obviously/palpably unreasonable, in that the entire roadway could not be viewed at the time of inspection in areas where parking was allowed." (Kolmus Expert Report at 17.) Kolmus also opined that the "lack of effective inspection methods resulted in the incident fall." (Id.) He suggested that Ocean City should have the streets inspected on foot and should prohibit parking on inspection days to ensure unfettered views. (Id. at 12-13.)

6.   Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."

Anderson v. Liberty Lobby, Inc._, 477 U.S. 242, 248 (1986). A fact
is "material" only if it might affect the outcome of the suit.
Id. The district court must "view the facts and draw reasonable
inferences in the light most favorable to the party opposing the
summary judgment motion." Scott v. Harris_, 550 U.S. 372, 378
(2007).

        7.    The New Jersey Tort Claims Act, N.J.S.A. 59:4-1 to
14-4, governs claims against governmental entities arising from
dangerous conditions on public property. Any application of the
Tort Claims Act "must start from its guiding principle, that is,
that immunity from tort liability is the general rule and
liability is the exception." Polzo v. County of Essex, 196 N.J.
569, 578 (2008) ("Polzo I") (internal citations omitted). Under
the Act, a plaintiff must show that the property was in a
dangerous condition, that the injury was proximately caused by
the dangerous condition, and that the dangerous condition created
a foreseeable risk of injury. N.J. Stat. Ann. § 59:4-2. In
addition, a plaintiff must show either that "a negligent or
wrongful act or omission" of a public employee created the
dangerous condition or that the "public entity had actual or
constructive notice of the dangerous condition . . . a sufficient
time prior to the injury to have taken measures to protect
against the dangerous condition." N.J. Stat. Ann. § 59:4-2(a)-
(b). The Tort Claims Act constructively imputes notice of the

dangerous condition to a public entity "only if the plaintiff establishes that the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition. . . ." N.J. Stat. Ann. § 59:4-3(b).

8.   Finally, the Act provides that, even if a dangerous condition existed and the public entity was on notice, the public entity nevertheless will be immune from liability "if the action the entity took to protect against the condition or the failure to take such action was not palpably unreasonable." N.J. Stat. Ann. § 59:4-2. "Palpably unreasonable" means more than ordinary negligence and imposes a steep burden on a plaintiff. Polzo I at 580. The term "implies behavior that is patently unacceptable under any given circumstances and it must be manifest and obvious that no prudent person would approve of its course of action or inaction." Coyne v. State, Dept. of Transp., 182 N.J. 481, 493 (2005). The Third Circuit has explained that in order to be "palpably unreasonable" under New Jersey law, actions must be the result of "capricious, arbitrary, whimsical or outrageous decisions of public servants." Waldorf v. Shuta, 896 F.2d 723, 738 (3d Cir. 1990) (internal citation omitted). The question of palpable unreasonableness is generally decided by the fact-finder as it constitutes a question of fact; "[n]evertheless, like any question of fact, the determination of palpable unreasonableness

is subject to a preliminary assessment by the court as to whether it can reasonably be made by a fact-finder considering the evidence." <u>Charney v. City of Wildwood</u>, 732 F. Supp. 2d 448, 457 (D.N.J. 2010), <u>aff'd,</u> 435 F. App'x 72 (3d Cir. 2011).

9.   For purposes of this motion, Plaintiffs have proffered admissible evidence that the pothole was a dangerous condition, that it was the proximate cause of Marie Robinson's injuries, and that her injuries were foreseeable. Plaintiffs allege both that Ocean City's negligent or wrongful road maintenance caused the dangerous condition and that Ocean City had constructive notice. Plaintiffs have not alleged that Ocean City had actual notice of the pothole. The Court will therefore analyze whether a reasonable jury could conclude that Ocean City's road maintenance program caused the dangerous condition, that Ocean City had constructive notice, and that Ocean City's actions or inactions were palpably unreasonable. The Court holds, as a matter of law, that the answer to each question is no.

10.   Ocean City did not create the dangerous condition. Plaintiffs argue that Ocean City "caused the pothole to form by failing to utilize proper preventive maintenance practices. . . ." (P. Opp'n at 13.) But the New Jersey Supreme Court has held, in assessing a case involving a defect in a road, that "[e]ven if we were to assume that the County had an inadequate inspection program, natural conditions—not a flawed inspection

program—'created' the depression on the shoulder of roadway. . . ." Polzo v. County of Essex, 209 N.J. 51, 66-67 (2012) ("Polzo II"). Plaintiffs' expert witness, Mr. Kolmus, acknowledged that cracks are inevitable and that potholes are formed when water filters through cracks into the layers below the asphalt surface. (Kolmus Expert Report at 11.) He explained that freezing and thawing of the water causes the road material to loosen and, eventually, potholes form. (Id.) Natural conditions, not allegedly flawed inspection programs, create potholes. The Polzo II court further explained that "[a] dangerous condition of property may be 'created' if, for example, a public entity's snow plow creates a pothole or the entity's paving of a roadway is negligently performed." Id. Plaintiff has never alleged that Ocean City's original paving of the road was negligent or that Ocean City's trucks created the hole. Even if, arguendo, Ocean City's program were inadequate, Ocean City, as a matter of law, did not create the dangerous condition that harmed Plaintiff Marie Robinson.

    11.  Ocean City did not have constructive notice of the dangerous condition. The New Jersey Supreme Court has held that "the mere existence of an alleged dangerous condition is not constructive notice of it." Polzo I at 581. The Polzo case involved a woman who lost control of her bicycle while riding across a depression in the roadway, crashed, and died. The

plaintiff in <u>Polzo</u>, the decedent's husband, argued that the road condition should have been noticed because it existed for a period of months, if not years, and because there had been many complaints about potholes in that area. <u>Polzo I</u> at 576-77. The <u>Polzo</u> plaintiff's only evidence to support the argument that the depression qualified for constructive notice was an expert report, which the New Jersey Supreme Court held to be insufficient.

12.  In the present case, Plaintiff's only evidence that the pothole met constructive notice requirements is also an expert report that does not establish that Ocean City had constructive notice. Plaintiff's expert, Mr. Kolmus, states, "The incident potholes were foreseeable to a qualified roadway maintenance manager." (Kolmus Expert Report at 12.) The report also says that untreated pavement cracking leads to potholes, that 32nd Street was "at or very near the end of the pavement's surface life," and that Kolmus observed cracks in the roadway that had not been filled or sealed. (Kolmus Expert Report at 11.)  These general statements do not establish constructive notice. The New Jersey Tort Claims Act establishes constructive notice when "the condition had existed for such a period of time and was of such an obvious nature that the public entity, in the exercise of due care, should have discovered the condition. . . ." N.J. Stat. Ann. § 59:4-3(b). The pothole at 32nd street may have been a

9

foreseeable condition because of cracking and the general road conditions, and the inevitable cycle of freezing and thawing, but that does not mean that the pothole itself "had existed for such a period of time and was such an obvious nature" that Ocean City had constructive notice.

13.  Plaintiffs cite Connelly v. AGL Resources, 2012 N.J. Super. Unpub. LEXIS 253 (N.J. App. Div. Feb. 7, 2012), to support their constructive notice argument. In that case, plaintiff Connelly stepped into a hole covered by leaves that was in the middle of a cross-walk. The hole may have been created by the city when it paved over an open gas main box and, if not, the city arguably had constructive notice because a police officer was assigned to that intersection and city departments regularly observed that area. The condition ought to have been discovered because Connelly alleged that it was ancient. The New Jersey Appellate Court reversed the trial court's grant of summary judgment for the defendants on the grounds that the city had either created the dangerous condition or had actual or constructive notice of it. Connelly is easily distinguishable because, since Polzo II rejected the argument that allegedly inadequate inspection programs cause dangerous conditions, there is no plausible allegation in this case that Ocean City created the dangerous condition. Secondly, there was no police officer stationed at the location where Plaintiff fell. And, third, in

Connelly, the hole was allegedly ancient, an essential fact that
Plaintiff has not argued here.  Connelly is therefore inapposite.

14.  Even if Ocean City did have constructive notice, its
actions (or nonactions) in maintaining its roadways were not
palpably unreasonable. The New Jersey Supreme Court has held that
public entities need not "employ the equivalent of roving pothole
patrols to fulfill their duty of care in maintaining roadways
free of dangerous defects." Polzo II at 56. The Polzo plaintiff
presented an expert witness who criticized the municipality's
inspection program. The Polzo II court emphasized that the expert
witness "did not offer any evidence to indicate that this
*suggested* program is an objective standard of practice or has
been adopted by other public entities." Polzo II at 663 (emphasis
in original).

15.  In this case, Plaintiff's expert witness recommended
improvements to Ocean City's program, but he did not cite any
recognized standard of care that mandates his recommended
inspection procedures, nor did he cite any recognized standard of
care indicating that Ocean City's methods are inadequate. The
Polzo II court emphasized that "[w]e cannot find that the absence
of a more systematic program violates the Tort Claims Act,
particularly when plaintiff has not provided this Court with any
recognized standard of care that demands otherwise." Polzo II at
69. Absent a showing that Ocean City's program violates

11

recognized standards of care, Ocean City's program is not, as a matter of law, unreasonable, let alone palpably unreasonable.[1] Plaintiff simply has not shown that Ocean City's inspection program is the result of "capricious, arbitrary, whimsical or outrageous decisions of public servants," as required for liability under the NJTCA, see Waldorf v. Shuta, 896 F.2d 723, 738 (3d Cir. 1990), or that "no prudent person would approve of its course of action or inaction," see Coyne v. State, Dept. of Transp., 182 N.J. 481, 493 (2005).

16.   The New Jersey Supreme Court held, in Polzo II, that "[t]his Court does not have the authority or expertise to dictate to public entities the ideal form of road inspection program, particularly given the limited resources available to them. . . ." Polzo II at 69. The Polzo II court explained its rationale by noting, in part, that "a public entity's discretionary decisions to act or not to act in the face of competing demands should generally be free from the second guessing of a coordinate branch

---

[1]Ocean City filed a Reply [Docket Item 26], challenging, inter alia, Kolmus' criticisms of Ocean City's road inspection methods. The Reply included an expert report and selected notes from the New Jersey Society of Municipal Engineers' Pavement Management Course. The notes describe the "Surface Condition Survey Methods" class module, which covers three survey methods, i.e. windshield, walking, and automated, and the benefits and drawbacks of each method. Plaintiff's expert's response [Docket Item 23-3] to this report was attached to Plaintiff's Opposition. If windshield surveys are a method taught in the New Jersey Society of Municipal Engineers' Pavement Management Course, that method is not palpably unreasonable.

of Government." Polzo II at 76 (internal citation omitted). If the New Jersey Supreme Court lacks the authority to dictate road inspection programs to municipal entities in New Jersey, then this federal Court certainly lacks that authority.

17.   Plaintiffs cite Roe v. New Jersey Transit Rail Operations, 317 N.J. Super. 72 (N.J. App. Div. 1998), to argue that Ocean City's actions were palpably unreasonable because Ocean City could have improved its inspection program with minor expenses and inconvenience. In Roe, Defendant NJ Transit bolted open a fence gate that led underneath the I-280 overpass. The plaintiff, a 12-year-old girl, cut through the gate on her way to a nearby park and was assaulted by a man who had been sitting underneath the overpass. The man brutally and repeatedly raped her. In discovery, police officers testified that there was general knowledge that the open gate was used, that the area under I-280 was dangerous because of seclusion and inadequate lighting, and that many crimes occurred at that location. In addition, NJ Transit's interrogatory answers established that the fence had originally been erected to prevent children from taking that shortcut under the overpass to the park. The Roe court held that, "NJ Transit made the conscious decision to weld the gate permanently open . . . [and] [t]here was ample evidence for a jury to conclude that NJ Transit was aware, or should have been aware of the fact that the gate, which was permanently bolted

13

open, led passersby into what could be considered the most dangerous park area under I-280. . . ." Roe at 78. The Roe court argued that relocating the gate or locking it and providing keys to authorized personnel would have caused minor expense and inconvenience and, therefore, a jury could conclude that NJ Transit's actions were palpably unreasonable. Roe is wholly inapposite to the case at bar. In this case, there is no allegation that Ocean City's affirmative actions led to the dangerous condition, nor that Ocean City had any knowledge of the dangerous condition, nor that Plaintiff's proposed inspection program would be as cheap and easy to implement as locking a gate.

18.   Plaintiffs cite other cases in support of their arguments regarding notice and palpable unreasonableness, but the Court also finds them unpersuasive because they are unpublished and they predate Polzo II, which was published on January 18, 2012 (and also, in some instances, they predate Polzo I, which was published on December 3, 2008). Regardless of publication date, the fact patterns in the cases support the Court's grant of summary judgment. See, e.g., Dupree v. City of Newark, 2011 N.J. Super. Unpub. LEXIS 794 (N.J. App. Div. Apr. 1, 2011) (summary judgment affirmed because no evidence concerning how long dangerous condition existed); Schmidt v. City of Bayonne, 2007 N.J. Super. Unpub. LEXIS 417 (N.J. App. Div. May 21, 2007)

(summary judgment reversed because record contained evidence that
deterioration creating pothole began three years prior to
incident); and <u>Barton v. Burlington County</u>, 2006 N.J. Super.
Unpub. LEXIS 2143 (N.J. App. Div. Oct. 30, 2006) (summary
judgment reversed because dangerous condition existed for at
least four years and was arguably created by faulty bridge
construction). These cases support the Court's holding that
summary judgment is appropriate because Ocean City did not create
the dangerous condition, Ocean City's maintenance program was not
palpably unreasonable, and Plaintiff has not adduced evidence
that the pothole "existed for such a period of time and was of
such an obvious nature that [Ocean City]. . . should have
discovered the condition. . . ." <u>See</u> N.J. Stat. Ann. § 59:4-3(b).

19.  Defendant Ocean City's Motion for Summary Judgment is
granted. Plaintiffs' claims against Ocean City will be dismissed.
In addition, as Plaintiffs have never identified the John Doe and
ABC Corporation Defendants and no named Defendants remain in the
action, the Court will terminate this action.

20.  The accompanying Order will be entered.


**November 14, 2012**                **s/ Jerome B. Simandle**
Date                                 JEROME B. SIMANDLE
                                     Chief U.S. District Judge

15